WILLIAM H. LINCOLN *vs.* BOSTON MARINE INSURANCE COMPANY.

Suffolk.    March 14, 15, 1893. — June 21, 1893.

Present: FIELD, C. J., ALLEN, HOLMES, MORTON, & LATHROP, JJ.

*Marine Insurance — Freight of each successive Voyage — Deviation — Indorsement on Policy — General Average.*

A policy of insurance against perils of the seas, fire, etc. insured "$5,000 on freight, under deck, on board or not on board said vessel, at and from N., via P., to S., and at and thence, privilege lumber port, to ports discharge, and/or loading west coast South America and at and thence to port of advice &/or discharge in Europe or Atlantic United States and fifteen days on vessel in port after arrival." Then

was added, "Held covered in event of deviation or change of voyage, for not exceeding eighteen months from date of this policy, at tariff rates of premium." The freight was valued at $15,000. The policy, which was a general form for both vessels and freight, contained clauses applicable to different classes of risks. Among them was the following: "It is also further agreed that voyage policies on freight on board or not on board shall attach at the first port specified, as soon as the inward cargo is landed, and no sooner, whether the vessel be under charter or not, and shall terminate at port or ports of destination with the landing of cargo, in proportion as amount hereby insured bears to full amount of freight or charter for the whole voyage insured. Time risks on freight shall attach and terminate in the same manner, applying to each cargo (or voyage, if in ballast and not chartered) successively, or to each charter successively in case vessel be chartered." Instead of sailing to the west coast of South America from T., where she took on board a cargo of lumber, the ship went to C., and was there chartered for a voyage to M. On December 12, 1891, one third of the cargo having been discharged at C., the defendant indorsed on the policy, "Having deviated from S. and T. to C., this policy now attaches at and thence via Philippine Islands to port of advice &/or discharge in Atlantic United States, and fifteen days on vessel in port after arrival. Addl$^n$. prem. @ 2½ $421. Fuller, Pst." On January 4, 1892, about two thirds of the lumber having been discharged, the ship caught fire and was scuttled and sunk. The cargo was substantially uninjured, and full freight from T. was collected thereon. The ship was beyond repair, and was condemned and sold. *Held*, in an action on the policy, that it covered only the freight of the voyage then ending, and did not insure any part of the freight of the next succeeding voyage, although there was a charter-party outstanding, and although it was assumed that the plaintiff had an insurable interest, and that this construction was not disturbed by the words "now attaches" in the indorsement of December 12, 1891.

CONTRACT, upon a policy of insurance against perils of the seas, fire, etc., dated November 25, 1890, for "sixteen thousand eight hundred and forty dollars; viz. $11,840 on ship W. H. Lincoln, collision clause attached, $5,000 on freight under deck, on board or not on board said vessel, at and from New York, via Philadelphia, to Seattle, and at and thence, privilege lumber port, to ports discharge, and/or loading west coast South America, and at and thence to port of advice &/or discharge in Europe or Atlantic United States, and fifteen days on vessel in port after arrival." Vessel valued at forty-five thousand dollars, and freight valued at fifteen thousand dollars, unless a larger amount at risk; then at actual freight. Stamped upon the policy in red ink at the time it was made was the following: "Held covered in event of deviation or change of voyage, for not exceeding eighteen months from date of this policy, at tariff rates of premium." And among the printed clauses contained in the policy was the following: "It is also further agreed that voyage policies

on freight on board or not on board shall attach at the first port specified, as soon as the inward cargo is landed, and no sooner, whether the vessel be under charter or not, and shall terminate at port or ports of destination with the landing of cargo, in proportion as amount hereby insured bears to full amount of freight or charter for the whole voyage insured. Time risks on freight shall attach and terminate in the same manner, applying to each cargo (or voyage, if in ballast and not chartered) successively, or to each charter successively in case vessel be chartered."

The plaintiff gave a premium note for the premium, amounting to thirteen hundred and eighty-two dollars and forty cents. The insurance on ship was paid, with a deduction for additional premium, as hereinafter appears, and the action is to recover the insurance made by the policy on freight, and return premium, as hereinafter stated.

Soon after the making of the policy, the ship sailed from New York and arrived, via Philadelphia, at Seattle, whence she sailed and arrived at Tacoma, a lumber port. There she took in a cargo of lumber for Sydney, N. S. W., and on September 8, 1891, sailed from Tacoma for Sydney, where she arrived in safety with her cargo on November 29, 1891.

On December 10, 1891, intelligence of her arrival at Sydney having reached the plaintiff, she was chartered for a voyage from Sydney to Manila with a cargo of coal.

On December 12, 1891, the plaintiff informed the defendant that the ship had gone from Tacoma to Sydney, instead of to the west coast of South America, and also informed the defendant of the making of the charter-party, and that the ship would proceed from Sydney to Manila; and the defendant thereupon, at the plaintiff's request, made upon the policy the following indorsement: " December 12, 1891. Having deviated from Seattle and Tacoma to Sydney, N. S. W., this policy now attaches at and thence via Philippine Islands to port of advice &/or discharge in Atlantic United States and fifteen days on vessel in port after arrival. Addl$^n$. prem. @ $2\frac{1}{2}$ $421. Fuller, Pst."

On December 12, 1891, when said indorsement was made, about one third of the cargo of lumber from Tacoma had been discharged at Sydney.

On the evening of January 4, 1892, the ship was lying at

Cowper's Wharf in Sydney, discharging her cargo of lumber, about two thirds thereof having been safely landed, when a fire broke out on board the ship, and the ship and cargo still remaining on board were in imminent peril of destruction. Thereupon the master voluntarily scuttled and sunk the ship for the purpose of saving the ship and remaining cargo from destruction, and succeeded thereby in saving the ship in a badly burned condition, and the cargo substantially uninjured. After the fire had been extinguished, the ship was raised and the remaining cargo was discharged, and full freight from Tacoma was collected on the cargo; but the ship was found upon survey to be so badly burned as to be a complete wreck and beyond repair, and, upon the recommendation of the surveyors, was sold by the master by auction, bringing net about eighteen hundred and thirty dollars. There was a constructive or technical total loss of the ship under the policy and according to its terms, aside from any question of general average.

By a correct apportionment in general average of the expenses and sacrifices resulting from the voluntary scuttling and sinking of the ship for the purpose of saving the ship, cargo, and freight from imminent peril, the amount thereof chargeable upon freight was eight hundred and eighty dollars and forty-six cents, of which one third is two hundred and ninety-three dollars and forty-eight cents.

The plaintiff claimed payment of the defendant of a total loss of ship and freight, and also of one third, amounting as aforesaid to two hundred and ninety-three dollars and forty-eight cents, of the expenses and sacrifices chargeable in general average upon freight.

The defendant paid a total loss of the ship, deducting the amount of the premium note, and four hundred and twenty-one dollars exacted by the defendant for the additional premium of two and one half per cent, mentioned in the aforesaid indorsement upon the whole policy under date of December 12, 1891, which sum exacted in payment of the additional premium the defendant still retained. The defendant admitted that it was liable to the plaintiff for the said sum of two hundred and ninety-three dollars and forty-eight cents, being one third of the expenses and sacrifices chargeable in general average upon freight;

but refused to pay for the total, or for any further loss of freight, and denied all liability further than for the two hundred and ninety-three dollars and forty-eight cents.

'The defendant contended that, if it was liable for the sum of five thousand dollars, it was not liable for any further sum.

The plaintiff contended that he was entitled to recover the said general average charge of two hundred and ninety-three dollars and forty-eight cents, and the further sum of five thousand dollars for total loss of freight, amounting in the whole to fifty-two hundred and ninety-three dollars and forty-eight cents, with interest thereon from June 27, 1892.   The plaintiff also contended that, if the defendant was not liable for total or further loss of freight, he was entitled to recover the general average charge, and also the four hundred and twenty-one dollars exacted by the defendant for additional premium, amounting together to seven hundred and fourteen dollars and forty-eight cents, with interest from June 27, 1892.

Upon the foregoing facts, such judgment was to be entered as law and justice might require.

*L. S. Dabney & F. Cunningham*, for the plaintiff.

*E. P. Carver*, for the defendant.

HOLMES, J.   The policy originally insured " $5,000 on freight, under deck, on board or not on board said vessel, at and from New York, via Philadelphia, to Seattle, and at and thence, privilege lumber port, to ports discharge, and/or loading west coast South America, and at and thence to port of advice &/or discharge in Europe or Atlantic United States, and fifteen days on vessel in port after arrival."   Then was added, " Held covered in event of deviation or change of voyage, for not exceeding eighteen months from date of this policy, at tariff rates of premium."   The freight was valued at $15,000.

The doctrine of *Thwing* v. *Washington Ins. Co.* 10 Gray, 443, 453, 454, and of the Supreme Court of the United States, with regard to policies very like the present, is that " the insurance was upon the freight of each successive voyage, and is to be applied to the freight at risk at any time, whether on the outward or homeward voyage, to the amount of the valuation." *Insurance Co. of the Valley of Virginia* v. *Mordecai*, 22 How. 111, 118.   *Hugg* v. *Augusta Ins. & Banking Co.* 7 How. 595, 610.

It is true that it does not appear, as it seems to have appeared in the former Massachusetts case, what proportion the valuation bore to the freight actually earned or expected to be earned under the successive charters of the vessel. But it is enough that nothing is shown to contradict or render improbable the above interpretation. In one respect, indeed, this case is stronger than those cited. The clause giving liberty to deviate makes the policy more nearly a time policy, and so subject to a provision, which we shall quote in a moment, the space limits being inserted only for the purpose of fixing the length of the time and the cases in which a further premium must be paid. We are of opinion that the cases cited apply.

But it is argued that, even if our construction of the policy be adopted, when the vessel was unloading, as fast as the policy became unnecessary for the protection of the freight of a discharging cargo, the freight of the next cargo should be held to succeed to the protection, so as to keep up a constant insurance of $5,000 upon freight valued at $15,000. The implication of the decisions to which we have referred is the other way, and the conclusion is strengthened by another provision of the policy. The policy is a general form used for both vessels and freight, and containing clauses applicable to different classes of risks. Among them is the following: "It is also further agreed that voyage policies on freight on board or not on board shall attach at the first port specified, as soon as the inward cargo is landed, and no sooner, whether the vessel be under charter or not, and shall terminate at port or ports of destination with the landing of cargo, in proportion as amount hereby insured bears to full amount of freight or charter for the whole voyage insured." Possibly this does not apply to an insurance like the present, or at any rate to an intermediate port. But it goes on: "Time risks on freight shall attach and terminate in the same manner, applying to each cargo (or voyage, if in ballast and not chartered) successively, or to each charter successively in case vessel be chartered." If these words do not apply literally to the case at bar, at least they furnish a striking analogy, and go far to confirm the implication of the rule laid down in the decisions. Apart from the question remaining to be considered, we are of opinion that, while the vessel was unloading, the policy covered

only the freight of the voyage then ending, and did not insure any part of the freight of the next succeeding voyage, although there was a charter party outstanding, and although we assume that the plaintiff had an insurable interest. No doubt the distinction is arbitrary between the positions immediately before and immediately after unloading the cargo. But contracts always are arbitrary in what they do or do not undertake. There is nothing irrational, however, in a contract of insurance on successive voyages, keeping each distinct, and the policy shows the defendant's habit and intent, in cases at least closely resembling this, to make that kind of policy. We refer to the clause which we have quoted as to time risks.

If the case stopped here we understand it to be agreed that by our construction the defendant would not be liable for freight. The freight on the cargo which was unloading at the time of the loss was all paid. But the vessel, instead of sailing to the west coast of South America from Tacoma, had gone to Sydney, where the loss occurred, and after her arrival there had been chartered for a voyage to Manila. On December 12, 1891, the defendant, being informed of the facts, made the following indorsement on the policy: "December 12, 1891. Having deviated from Seattle and Tacoma to Sydney, N. S. W., this policy now attaches at and thence via Philippine Islands to port of advice &/or discharge in Atlantic United States, and fifteen days on vessel in port after arrival. Addl$^n$. prem. @ $2\frac{1}{2}$ $421. Fuller, Pst." It is argued that the words "now attaches" made the policy attach at once to the Manila freight, and that otherwise the indorsement was unnecessary. But we think this is straining the word "now" too far. "Now" seems to us merely to mark the antithesis between the former and the present description of the voyage, and to accept the new description henceforth. It means "after and in view of the deviation mentioned." The indorsement may not have been absolutely necessary, considering the clause which we have quoted as to deviation, but it fixed specifically the additional premium which by the terms of the original policy was to be paid, and gave the insured the advantage of an express assent to the very things done and intended, instead of a general permission which included them only by construction.

By the terms of the agreed statement, the plaintiff is entitled to judgment for $293.48, admitted to be due from the defendant as a general average charge on freight, but for nothing more.

*Judgment for the plaintiff for $293.48.*